ABDUL KHALIF CALHOUN,                        CIVIL NO. 09-683 (MJD/JSM)

      Plaintiff,

v.                                 <u>REPORT AND RECOMMENDATION</u>

CORRECTIONS CORPORATION OF
AMERICA "PRAIRIE CORRECTIONAL
FACILITY," TIMOTHY WENGLER,
MRS. SEIDL, MR. KOOSMAN, MAYER,
MAUS, RIELAND, and ASMUSSEN,

      Defendants.

JANIE S. MAYERON, United States Magistrate Judge

The above matter comes before the undersigned upon defendants' Motion for Summary Judgment [Docket No. 27]; plaintiff's Cross Motion for Summary Judgment [Docket No. 50]; plaintiff's Motion for Response to Defendants' Summary Judgment [Docket No. 61]; and Motion for Telephonic Appearance [Docket No. 69]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.    BACKGROUND

Plaintiff Abdul Khalif Calhoun ("Calhoun") was convicted of first-degree robbery and burglary, second-degree assault, and drug possession. <u>See</u> Affidavit of Kathleen D. McMahon ("McMahon Aff."), Ex. A. Calhoun was confined at the Prairie Correctional Facility ("PCF") at all times relevant to this action. PCF is owned by defendant Corrections Corporation of America ("CCA"). <u>See</u> Defendants' Memorandum

in Support of Summary Judgment ("Defs.' Mem.") at p. 2. CCA is under contract to house inmates for the State of Washington Department of Corrections ("WDOC"). <u>See</u> McMahon Aff., Ex. B (Contact between PCF and the WDOC). Calhoun had been transferred from the prison in Washington to PCF. <u>See</u> Defs.' Mem. at p. 2. Calhoun has since been transferred to Coyote Ridge Correctional Center in the State of Washington. <u>See</u> Docket No. 55.

The gravamen of Calhoun's suit is that based on certain policies regarding the ordering and purchasing of books from approved and non-approved vendors, PCF and the individual named defendants repeatedly denied Calhoun's requests to obtain certain books from a vendor that was not on PCF's approved list of vendors. Calhoun claimed that this denial violated his rights under the First Amendment of the Constitution as evidenced by CCA's own policies, the Western Interstate Corrections Compact applicable to Washington inmates (RCW § 72.70.010), the contract between WDOC and CCA, and WDOC Policies 450.100 and 590.500. Defendants disagreed with Calhoun's contention, maintaining that they had no obligation to adhere to the policies and contract governing Washington prisoners, and their refusal to permit Calhoun to buy the books he wanted was based on facility policies that were reasonably related to legitimate penological interests.

### A. <u>Policies, Statute and Contract at Issue</u>

#### 1. CCA and PCF Policies

The relevant portions of the policies at issue are as follows:

CCA Corporate and Facility Policy No. 16-1 ("CCA Policy 16-1") provides:

16-1.1 PURPOSE:

To establish procedures whereby restrictions of inmate/resident mail, if necessary, can take place.

16-1.2 AUTHORITY:

Turner v. Safely, 107 S.Ct. 2254 (1987); Thornburgh v. Abbott, 109 S.Ct. 1874 (1989); Corporate and Facility Policy.

* * *

16-1.4 POLICY:

There will be no limitation as to the number of letters an inmate/resident may send or receive or on the length, language, content or source of the mail, except where there is clear and convincing evidence to justify the limitations for reasons of public safety or facility order and security. All publications such as books and periodicals must be received from a publisher unless deemed to constitute a tangible threat to the security of the institution. However, at some facilities the contracting agency requires publications to be sent from a vendor.

* * *

16-1.5-D LIMITS ON AMOUNT OF CORRESPONDENCE

2.    A limit may not be imposed on the amount of correspondence an inmate/resident is allowed to send or receive except where reasonable belief exists to justify the limitations for reasons of public safety or facility order and security.

* * *

16-1.5-H.    PUBLICATIONS

1.    Books, magazines, newspapers, and other printed matter may only be mailed to an inmate/resident from a publisher or a vendor/book club. At some facilities the contracting agency allows the books and publications to be sent from a vendor.

2.      Books, magazines, newspapers and other printed matter may be approved for inmates/residents unless deemed to constitute an immediate and tangible threat to the security or order of the facility or to inmate/resident rehabilitation by meeting one or more of the following criteria:

a.      The material contains instructions for the manufacturing of explosives, weapons, drugs or drug paraphernalia or alcoholic beverages;

b.      The material advocates violence within the facility;

c.      The material is of a type which has demonstrably caused violence or other serious disruption of facility security or order within the facility or similar facilities;

d.      The material advocates racial, religious, or national hatred in such a way so as to create a serious danger of violence in the facility;

e.      The material is of a nature which encourages deviate sexual behavior which is criminal and/or in violation of facility rules or detrimental to rehabilitation; and/or

f.      The publications was [sic] not sent from a publisher.

* * *

16-1.5-J.      PACKAGES

1. Each Warden/Administrator may make available to the inmate/resident population a list of items which may be received in packages.

2. Any person may purchase and send such approved items to any inmate/resident. However, at some facilities the contracting agency allows the package to only be sent from a vendor.

**AT THIS FACILITY, THE ITEMS WHICH MAY BE RECEIVED IN PACKAGES ARE AS FOLLOWS**:

**<u>Inmates are allowed to receive packages only from approved vendors at this facility.</u>**

**THE NUMBER OF PACKAGES WHICH MAY BE RECEIVED ARE AS FOLLOWS:**

**Inmates may receive packages once in each quarter as scheduled.**

3. All incoming packages will be inspected for contraband. Any incoming package which is privileged correspondence will be treated according to the procedures for privileged mail.

**AT THIS FACILITY, ADDITIONAL PROCEDURES RELATING TO PACKAGES ARE AS FOLLOWS:**

**Inmates may receive packages once each quarter from approved vendors ONLY. A limit of not more than one package each, from a maximum of two vendors, may be ordered at the time of the order. A specific schedule for the receipt of packages per quarter is as follows:**

**January, April, July, & October - PCF number ends in 1, 2, or 3.**

**February, May, August. & November - PCF number ends in 4, 5, or 6.**

**March, June, September, & December - PCF number ends in 7, 8. 9, or 0.**

**Packages will contain only those items allowed in Policy 9-102,[1] Inmate Property. Quantities may not exceed the totals allowed. If an order would exceed the allowed totals, the excess property must be disposed of - as provided by Policy - prior to issuance of the incoming property**.

---

[1] The Court was not provided with a copy of CCA Policy 9-102.

<u>See</u> Affidavit of Assistant Warden Barbara Seidl Schreier in Support of Defendants'
Motion for Summary Judgment ("Schreier Aff."), Ex. 1; Pl.'s Ex. Z (emphasis in
original).[2]

PCF also issued a Memorandum on May 12, 2008 ("PCF Memorandum") to all
PCF inmates, entitled "Package/Property Orders, Clothing Exchange." Schreier Aff.,
Ex. 2. The relevant portion of this Memorandum stated:

> • All property/package orders must originate (money
> and request/order form – unless specifically stated
> otherwise) from this facility.
>
> • Case managers must sign off on all money order
> requests regarding approved purchases.
>
> • Any item/package that arrives at Prairie Correctional
> Facility, not having come from an approved vendor (free or
> not) or not having prior authorization will not be allowed.
> This includes packages/orders/money not originating from
> PCF.
>
> • If you cannot find an item (book/tape) from an
> approved vendor, you may request to your Unit Manager,
> approval from another reputable/verifiable vendor.
>
> **Package Orders**: The following vendors are approved for
> general package orders. Catalogues are available in the
> library for viewing.
>
> &ast; &ast; &ast;
>
> *Edward R. Hamilton, Bookseller*
> Falls Village, CT 06031-5000

---

[2]    In Calhoun's briefs, he cited to his own exhibits, however, he did not attach the
exhibits to the various affidavits he filed with the Court in response to defendants'
motion for summary judgment and in support of his own motion for summary judgment.
This Court has determined that the exhibits referenced in Calhoun's briefs were
attached to his verified Complaint [Docket No. 2] as Docket No. 4. Therefore, the
Court's citation to "Pl.'s Ex." refers to plaintiff's exhibits included in Docket No. 4.

* * *

**Educational Items**.  All items not listed on the Cell Property list[3] or sought from a non-approved vendor must have the Educational Counselor's/Principal's prior approval, including correspondence courses.

Id.

## 2.     Western Interstate Corrections Compact

The State of Washington has adopted the Western Interstate Corrections Compact.  See RCW 72.70 et seq.  The provisions of this Act bearing on this Court's analysis can be found in RCW § 72.70.010, Article IV, entitled "Procedures and Rights."

(e) All inmates who may be confined in an institution pursuant to the provisions of this compact shall be treated in a reasonable and humane manner and shall be cared for and treated equally with such similar inmates of the receiving state as may be confined in the same institution. The fact of confinement in a receiving state shall not deprive any inmate so confined of any legal rights which said inmate would have had if confined in an appropriate institution of the sending state.

* * *

(h) Any inmate confined pursuant to the terms of this compact shall have any and all rights to participate in and derive any benefits or incur or be relieved of any obligations or have such obligations modified or his status changed on account of any action or proceeding in which he could have participated if confined in any appropriate institution of the sending state located within such state.

## 3.     Contract Between WDOC and CCA

Pursuant to RCW § 72.70.010, CCA and WDOC entered into a contract that contained the following relevant provisions:

---

[3]     The Cell Property list was not provided to the Court by the parties.

4.01 <u>General Duties and Liquidated Damages.</u> The management of WDOC offenders in the Facility shall be consistent with the management of other offenders at the Facility and in accordance with the Operating Requirements.[4]

\* \* \*

4.01.2    CCA will exercise authority to ensure that the daily operation of the Facility is in compliance with the provisions of this Contract. Subject to the provisions of this Contract, CCA shall provide WDOC Offenders care and treatment, including the furnishing of subsistence and routine and emergency medical care, provide for their physical needs, make available work, training and treatment programs, retain them in safe, supervised custody, maintain proper discipline and control, make certain that sentences and orders of the committing court are faithfully executed, provide reasonable access to the courts, and otherwise comply with applicable law.

\* \* \*

Section 4.13    <u>Access to Courts.</u>    CCA will provide opportunity for meaningful access to federal and Washington State legal materials at the Facility in accordance with security and operating needs.

\* \* \*

Section 9.12  <u>Compliance with Applicable Laws.</u> CCA shall, at all times during the performance of its obligations of this Contract, strictly adhere to all applicable federal laws and regulations,

\* \* \*

Section 9.18    <u>No Third Party Benefit.</u> This Contract shall benefit and burden the parties hereto in accordance with its terms and conditions and is not intended, and shall not be deemed or construed, to confer any rights, powers, benefits or privileges on any person or entity other than the parties to

---

[4]    The contract defined "Operating Requirements" as: "applicable federal, state, and local law and court orders; constitutional minimum standards; WDOC regulations made applicable to CCA and this Contract. If there exists a difference between any of these, the higher standard shall be followed as determined by the WDOC."

this Contract. This Contract is not intended to create any rights, liberty interests, or entitlements in favor of any WDOC Offender. The Contract is intended only to set forth the contractual rights and responsibilities of the Contract parties. WDOC Offenders shall have only those entitlements created by Federal or Washington constitutions) statutes, regulations or case law.

McMahon Aff., Ex. B.

### 4.    WDOC Policies 450.100 and 590.500

WDOC Policy 450.100, entitled "Mail for Offenders," allows inmates in stand-alone facilities to "receive a reasonable number of new or used books from a publisher or approved vendor," and states that inmates "may receive a reasonable number of new books sent directly from the publisher provided they meet the requirements of this policy and facility requirements regarding property retention." WDOC Policy 450.100, Section VIII.A.[5]    However, inmates cannot receive publications "outlined in the document entitled "Unauthorized Mail" attached to WDOC Policy 450.100. <u>See</u> WDOC Policy 450.100, Section VIII.B.   The attachment entitled "Unauthorized Mail" sets out 35 different categories of mail that offenders are not be allowed to receive for any reason. WDOC 450.100 Attachment 1.[6]  Categories 26 and 27 provide:

> 26. Publications (i.e., reproduced handwritten, typed/printed, or pictorial materials including books, periodicals, newspapers, magazines, and pamphlets) and catalogs (i.e., a publication predominantly or substantially focused on offering items for sale) not mailed directly from the publisher/retailer. Clippings of newspaper and magazine

---

[5]    WDOC Policy 450.100 was located at: http://www.doc.wa.gov/policies/default.aspx?show=4000.

[6]    WDOC Policy 450.100 Attachment 1 was located at: http://www.doc.wa.gov/policies/default.aspx?show=4000.

articles not mailed directly from the publisher/retailer are permitted in quantities identified above.

27. Mail containing items that were not ordered, paid for, and approved in advance through facility designated channels.

WDOC Policy 590.500 addresses legal access for offenders.[7]   Generally, this policy requires that all inmates be given the opportunity to research and prepare legal matters related to their sentence and confinement and actions related to their civil rights.   Offenders are allowed to purchase and retain personal legal reference books and materials from authorized sources, subject to property limitations.   In addition, inmates are permitted access to a law library that includes relevant and up-to-date constitutional, statutory, and case materials, applicable rules and practice treatises.

**B.**     **Plaintiff's Requests for Books and Defendants' Denial of These Requests**

On July 2, 2008, Calhoun submitted an Inmate Letter to defendant Chief of Unit Managers Koosman ("Koosman") asking for permission to obtain for his pending appeal the book "Redemption Manual 4th ed." from an alternative vendor, which PCF's approved vendors did not carry.   McMahon Aff., Ex. C; Pl's Ex. B.   Calhoun was told that he needed to go through defendant Unit Manager Mayer ("Mayer") for his request. Id.   The same day, Calhoun sent another Inmate Letter to Assistant Warden Barbara Seidl Schreier ("Schreier") requesting approval to obtain a "self help" educational research manual case titled the "Redemption Manual 4th ed." from a company in Oregon and offering to provide the book list information and information regarding the book seller so that staff could substantiate his request.   McMahon Aff., Ex. D; Pl.'s Ex.

---

[7]     WDOC Policy 590.500 was located at: http://www.doc. wa.gov/policies/default.aspx?show=500.

C. Assistant Warden Schreier responded, "Calhoun, all items must be ordered from an approved vendor." Id. On July 7, 2008, Calhoun sent an Inmate Letter to Unit Manager Mayer stating that pursuant to the PCF Memorandum issued to all Washington inmates, an inmate could request a book from a reputable and verifiable alternative vendor to the extent that a book could not be obtained from an approved vendor. McMahon Aff., Ex. E; Pl.'s Ex. D. Calhoun indicated that as the approved vendor, Edward R. Hamilton, did not carry "The Redemption Manual," he sought approval to acquire the book from "another reputable/verifiable vendor/publisher located in Oregon." Id. Mayer responded that all orders had to come from an approved vendor. Id.

Calhoun sent another letter to Unit Manager Mayer asking him to set forth why he had been refused permission to acquire legal "self help" educational information from a publisher or vendor other than Edward R. Hamilton, when CCA Policy 16-1.5-H provides that "books, magazines, newspapers and other printed matter may be approved for inmates unless deemed to constitute an immediate and tangible threat to the security or order of the facility authorizes a transaction to be executed." McMahon Aff., Ex. F; Pl.'s Ex. H. Mayer responded on July 17, 2008, by reiterating that Calhoun needed to go through an approved vendor and invited Calhoun to speak with him about the issue. Id.

On July 16, 2008, Calhoun submitted an Informal Resolution form, complaining that Unit Manager Mayer had denied him the means of receiving a book from a non-approved vendor pursuant to CCA Policy 16-1.5-H, and argued that this refusal violated

his rights under WDOC Policy "450.100 B, 1, C, and G"[8] and the First Amendment

under the United States Constitution.  McMahon Aff., Ex. G; Pl.'s Ex. F.  Grievance

Coordinator Asmussen ("Asmussen") and Warden Timothy Wengler ("Warden

Wengler") denied the grievance, asserting that "Mr. Mayer has the authority to do that,

we don't follow WA policy."  McMahon Aff., Ex. H; Pl.'s Ex. G.  Calhoun responded by

sending two different Inmate Letters to Unit Manager Mayer.  In the first letter, he asked

Mayer to verify why he refused Calhoun the ability to acquire "self help" educational

information from a publisher or vendor other than Edward Hamilton when CCA Policy

16-1.5-H provides that books and other printed matter may be approved for inmates

unless deemed to constitute an immediate and tangible threat to the security or order of

---

[8]     The Court believes Calhoun was referring to WDOC Policy 450.100, Section VIII
(B)(1), C and G which provide as follows:

> B.     Publications will be restricted for reasons outlined in
> Unauthorized Mail (Attachment 1).
>
> 1.     Publications deemed a threat to legitimate penological
> objectives, or sexually explicit per Attachment 1, must be
> immediately sent to the Headquarters Correctional Manager
> responsible for Department offender mail operations for a
> decision on restricting the publication Department wide.
>
> * * *
>
> C.     No publications will be withheld solely on the basis of
> their appeal to a particular ethnic, racial, religious, or political
> group or sexual orientation.
>
> * * *
>
> G.     Offenders may receive gift subscriptions and/or
> publications from any party other than another offender, or
> the friends or family of another unrelated offender.

WDOC Policy 450.100, http://www.doc.wa.gov/policies/glossary.aspx?Policy=450.100.

the facility. Mayer responded that Calhoun needed to go through an approved vendor and invited Calhoun to stop by his office to discuss the matter. Pl.'s Ex. H. In the second letter, dated July 17, 2008, Calhoun stated that he understood he could only order a book from an approved vendor, but that he was asking permission to buy a book from an alternative vendor because the approved vendor did not supply the legal manual and that Mayer had the authority to permit him to use an alternative vendor. McMahon Aff., Ex. I; Pl.'s Ex. H, p. 2. Mayer responded by asking Calhoun to stop by his office if he wished to discuss his request. Id.

On August 22, 2008, Calhoun submitted an Inmate Letter to Education Principal Daniel Anderson ("Anderson") in the Educational Department requesting permission to order the following books "germane to 'Self Help' education subject matter": "The Coming Battle" (1899); "The Redemption Manual" Fourth Edition; and "Cracking the Code" 4th Edition. Complaint, ¶ 21; McMahon Aff., Ex. J; Pl.'s Ex. A. Anderson approved Calhoun's request to receive these books on August 26, 2008. Id.

On November 3, 2008, Calhoun sent an Inmate Letter to Mr. Hunt requesting permission to order the following books "germane to 'Self Help' education subject matter": "The Coming Battle" (1899) and "The Redemption Manual" Fourth Edition. McMahon Aff., Ex. K; Pl.'s Ex. I A. Case Manager Rieland ("Rieland") answered on behalf of Mr. Hunt and denied the request on the basis that the books were not from PCF's approved vendors. Id.

On November 6, 2008, Calhoun sent an Inmate Letter to Assistant Warden Schreier requesting permission to order from the American's Bulletin the books "The Coming Battle" (1899) and "The Redemption Manual" Fourth Edition. McMahon Aff.,

Ex. L; Pl.'s Ex. J.  Calhoun noted that CCA Policy 16-1.5-H provided that books may be approved for inmates unless they are deemed to constitute an immediate and tangible threat to security or inmate rehabilitation and that the access to information is protected by the First Amendment.  Id.  Defendant Unit Manager Maus ("Maus"), acting on behalf of Assistant Warden Schreier, responded that an answer had already been given to him on this subject.  Id.

On November 10, 2008, Calhoun sent an Inmate Letter to Unit Manager Maus asking for permission to acquire "The Coming Battle" and "The Redemption Manual" Fourth Edition, in order to learn about the discipline of "Laissez Faire."  McMahon Aff., Ex. M; Pl.'s Ex. K.  Calhoun noted that these books were not carried by the approved vendor, Edward R. Hamilton, and asked for permission to obtain the books from an alternative outside vendor, The American Bulletin.  Id.  Calhoun listed in the letter the contact information for The American Bulletin.  Id.  Maus responded that Calhoun was required to purchase books through an approved vendor, and that if he wanted an educational book for class he needed to get permission from the education director.  Id.  Calhoun replied to Maus' response on November 17, 2008, asking that if the approved vendor did not carry specific books needed for legal purposes, what process should he follow to seek approval to utilize an alternative vendor.  McMahon Aff., Ex. N; Pl.'s Ex. L.  Maus responded that PCF had a more than adequate law library for him to utilize and that it was the discretion of the unit manager to allow items to be ordered outside of an approved vendor.  Id.  On November 20, 2008, Calhoun sent another Inmate Letter to Maus stating that he understood that CCA and PCF's sole vendor was Edward R. Hamilton, and then asked whether she would "accept, approve, allow or permit [him] to

acquire books, manuals or publications from another vendor or source other than 'Edward R. Hamilton'? Please answer 'Yes' or 'No.'" McMahon Aff., Ex. O; Pl.'s Ex. M. Maus circled "No" and stated she had already provided that PCF had an adequate law library and that she did not feel it was necessary for him to order from an outside vendor. Id. Maus suggested that Calhoun speak with Edward R. Hamilton to see if it would order the books he was requesting. Id.

On November 20, 2008, Calhoun sent an Inmate Letter to Assistant Warden Schreier stating that he understood that CCA and PCF's sole vendor was Edward R. Hamilton and asking that if the approved vendor did not carry specific books needed for legal "self help" or to pursue his legal matter, was there a process to allow inmates to obtain needed books. McMahon Aff., Ex. P; Pl.'s Ex. N. Assistant Warden Schreier responded that the process was posted in the units, but since Calhoun was not in the general population, he could request books from a verifiable and reputable vendor via his unit manager. Id.

On December 4, 2008, Calhoun sent an Inmate Letter to Warden Wengler seeking approval to acquire "The Coming Battle" and "The Redemption" from an outside vendor. McMahon Aff., Ex. Q; Pl.'s Ex. O. On December 16, 2008, Assistant Warden Schreier answered on behalf of Warden Wengler stating:

> The Coming Battle is about the Battle of Germany and The Redemption says "this manual will teach you about the process that will take you from being A BETTER SLAVE ON THE PLANTATION TO A SECURED PARTY CREDITOR" – you will have to convince me how these two books are legally necessary.

Id.

On December 5, 2008, Calhoun sent an Inmate Letter to Warden Wengler notifying the Warden of his intent to submit an informal grievance to address the denial of legal reference books, which are not detrimental to the security, good order or discipline of the institution. McMahon Aff., Ex. R; Pl.'s Ex. P. Calhoun submitted that the denial of his requests violated the contract between the WDOC and the CCA (§ 9.18) and the Constitution, which afforded him the right to access obtain legal references. Id. Unit Manager Maus responded "that is your choice"; Assistant Warden Schreier answered on behalf of Warden Wengler by referring him to her December 16, 2008 response. Id.; Pl.'s Ex. Q.

On December 17, 2008, Calhoun sent two Inmate Letters to Assistant Warden Schreier, stating that pursuant to the CCA and WDOC contract, § 9.18, WDOC offenders are required to have those entitlements set forth by the Federal and Washington constitutions, regulations or case law. McMahon Aff., Ex. S; Pl.'s Ex. R. Therefore, he claimed that he was entitled to the "The Redemption Manual" and "The Coming Battle," two books he desired and needed for his legal appeal. McMahon Aff., Ex. T. Assistant Warden Schreier responded that the books he requested were not legal references material and forwarded his requests to his unit manager. Id.

On December 21, 2008, Calhoun sent an Inmate Letter and a detailed letter responding to Assistant Warden Schreier's assertion that the books he requested were not legal in nature and referring her to CCA Policy 16-1.5-H, subsections 2(a) – (f). McMahon Aff., Exs. U, W; Pl.'s Exs. S, T. Calhoun stated that the two requested books did not provide a security threat and thus, the denial of his requests were arbitrary and not reasonably related to a legitimate penological interest. McMahon Aff., Ex. W; Pl.'s

Ex. S.  Calhoun also provided that he had two appeals pending in the State of Washington and that these books explained various aspects of criminal, civil and administrative law in order to "perfect and complete the legal process for me to accomplish the status and legal condition of a Secured Party Creditor/Ens Legis/Sui Juris.  And in doing so. . . successfully 'state a claim upon which relief can be granted' in the Washington State Judicial System."  Id.  Calhoun expressed his belief that he was entitled to obtain these books, at his own expense, under the First Amendment.  Id.  On December 22, 2008, Assistant Warden Schreier responded that the requested books were not legal references and that he needed to refer his request to his unit manager. McMahon Aff., Ex. U; Pl.'s Ex. S.

On December 22, 2008, Calhoun sent an Inmate Letter to Assistant Warden Schreier, giving notice that he was exhausting his administrative remedies relating to PCF staff's refusal to provide him with access to information in violation of the First Amendment and that he intended to file a claim in court for the violation of his civil rights.  McMahon Aff., Ex. V; Pl.'s Ex. T.  Assistant Warden Schreier responded that she was not going to approve the requested materials from a non-approved vendor and that if he had already gone through his unit manager, the next step was to make a request from Chief of Unit Managers Koosman.  Id.

On December 25, 2008, Calhoun submitted an Informal Resolution form complaining that he had requested permission to order books from an alternative vendor to no avail, despite CCA Policy 16-1.5-H, which authorized such a process. McMahon Aff., Ex. X; Pl.'s Ex. W.  According to Calhoun, Warden Wengler, Assistant Warden Schreier, and Unit Manager Maus refused to honor the CCA policy and his

rights under the First Amendment and §§ 4.01, 4.01.2, 4.13, 9.12 and 9.18 of the CCA and WDOC contract, which gave him the right of access to "self-help" educational materials. Id. Calhoun argued that the books were not a threat to the security of the facility, and that he did not need to justify or substantiate that any books he wanted were legal, as long as the books were not detrimental to the security of the institution. Id. Calhoun also indicated that he had already been approved once before to receive these books. As a result of the informal resolution request, Assistant Warden Schreier, Unit Manager Maus and Case Manager Rieland met with Calhoun. Id. The grievance was denied on grounds that the requested books were not from an approved vendor and were not legitimate legal materials based on Maus's review of an overview of the books on the internet. Id. According to Maus, the books dealt with "slavery" and "the German War." Id. Calhoun objected to this finding, and outcome of the informal resolution process was deemed "unresolved." Id.

On January 6, 2009, Calhoun sent an Inmate Letter to Assistant Warden Schreier asking whether WDOC Mail Policy 450.100, Section VIII and WDOC Policy 590.500, bearing on Legal Access for Offenders, applied to him while he was housed at PCF and why she would deny him the benefits of both policies. McMahon Aff., Ex. Y; Pl.'s Ex. U. On January 8, 2009, Assistant Warden Schreier responded that only the CCA mail policy applied, and that she was in charge of approving religious materials and was not the approving authority for other non-approved items or vendors. Id. Calhoun then sent an Inmate Letter to Case Manager Rieland asking if the WDOC Policies 450.100 and 590.500 applied to him while he was housed at PCF. McMahon Aff., Ex. Z; Pl.'s Ex. V. Rieland stated that he had reviewed the WDOC mail policy, but

then stated that Assistant Warden Schreier had already addressed this issue several times and referred to her January 8, 2009 response. Id. Calhoun also sent an Inmate Letter to Chief of Unit Management Koosman for permission to order "The Coming Battle" and "The Redemption Manual" and "Cracking the Code" from an outside book vender. Id., McMahon Aff., Ex. AA; Pl.'s Ex. Y. In response, Koosman asked Calhoun to report to his office. Id.

On January 12, 2009, Calhoun filed an Inmate Grievance. McMahon Aff., Ex. BB; Pl.'s Ex. X. Calhoun's grievance stated that Warden Wengler, Assistant Warden Schreier, Chief of Unit Management Koosman, Unit Manager Mayer, Unit Manager Maus and Case Manager Rieland all denied him the ability to order "self-help educational information from an alternative vendor" because the exclusive vendor Edward R. Hamilton did not carry the book. Id. at p. 2. Calhoun explained that he had previously sent a request to CCA/PCF's former Educational Department Principal Anderson seeking permission to order the books and Anderson had approved his request on August 26, 2008. Id. Nevertheless, despite this approval, Calhoun argued that Wengler, Schreier, Koosman, Mayer, Maus and Rieland rejected the request in violation of the First Amendment, the CCA/PCF and WDOC contract, CCA Policy 16-1.5-H, WDOC Policies 450.100 and 590.500 and case law. Id. at pp. 2-3. On January 26, 2009, Grievance Coordinator Asmussen denied any relief on the basis that the requested books were not sold by an approved vendor. Id. at p. 4. While Asmussen acknowledged that Calhoun could request to make a purchase from an outside vendor, it did not mean that such a request would be approved. Id.. Asmussen

recommended contacting the approved vendor to see if it could get the materials for Calhoun or submitting a request to the library. Id.

On January 13, 2009, Calhoun wrote to the approved vendor Edward R. Hamilton to request that it obtain for him the three books he was seeking to acquire. Pl.'s Ex. W at Ex. B.[9]  Similarly, Calhoun requested the PCF library obtain a copy of the "The Redemption Manual" and "The Coming Battle."  See Plaintiff's Objection to Defendants' Motion for Summary Judgment and Cross Motion for Summary Judgment and Memorandum of Law in Support ("Pl.'s Mem."), Ex. A-2.[10]  The PCF Library denied Calhoun's request on January 29, 2009, on the basis that the books were not available, and Calhoun never received a response from vendor Edward R. Hamilton.  See Calhoun Affidavit dated January 25, 2010, ¶ 6 [Docket No. 47]; Calhoun Affidavit dated February 18, 2010, ¶ 6 [Docket No. 65]; Pl.'s Mem. at p. 18.

Calhoun appealed the grievance decision and it was denied on February 9, 2009, because the books were not allowed.  McMahon Aff., Ex. BB at p. 4; Pl.'s Exs. W at Ex. C. X at p. 4.  According to the appeal decision, even though Anderson had approved the materials, the approval was against facility's practice.  Id.

---

[9]     This Exhibit is can be found at page 34 of Docket No. 4.

[10]     On March 18, 2010, Calhoun's Response to Defendants' Motion for Summary Judgment dated February 18, 2010, was filed [Docket No. 64].  This brief appears to be identical to Plaintiff's Objection to Defendants' Motion for Summary Judgment and Cross Motion for Summary Judgment and Memorandum of Law in Support filed on February 1, 2010 [Docket No. 49].  Therefore, when describing the arguments of Calhoun in his briefs in support of his motion for summary judgment and in opposition to defendants' motion for summary judgment, the Court will only cite to the memorandum filed by him on February 1, 2010 ("Pl.'s Mem.").

## C.    <u>The Complaint</u>

On March 24, 2009, Calhoun filed the Complaint in this action under 42 U.S.C. § 1983. <u>See</u> Docket No. 1. Calhoun alleged that defendants Warden Wengler, Assistant Warden Schreier, Chief of Unit Management Koosman, Unit Manager Mayer, Unit Manager Maus, Case Manager Rieland and Grievance Coordinator Asmussen deprived him of his right to access to information while functioning within their individual and official capacities, all in violation of the First Amendment, CCA Policies, the contract between WDOC and CCA, and WDOC policies. For relief, Calhoun sought (1) a declaration that defendants' acts violated his rights under the Constitution; (2) a preliminary and permanent injunction ordering defendants to comply with CCA Policy 16-1.5-H governing publications and WDOC Policies 450.100 and 590.500 governing mail and legal access for offenders; (3) a declaratory judgment addressing his status under § 9.18 of the contract between CCA and WDOC; (4) compensatory damages in the amount of $11,111 against each defendant; and (5) punitive damages in the amount of $13,111 against each defendant. Plaintiff's Supplemental Attached Statement of Claim [Docket No. 2] at pp. 27-28.

On December 18, 2009, defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. [Docket No. 27]. On February 1, 2010, Calhoun served and filed his cross motion for summary judgment. [Docket No. 50].

## II.    STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v.</u>

Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D.Minn. 2003) (citations omitted). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

## III.   ANALYSIS

### A.   **First Amendment Claim**

The First Amendment protects an inmate's right "to receive information and ideas." Kleindienst v. Mandel, 408 U.S. 753, 762-63 (1972) (internal citations omitted).

As the Seventh Circuit recently observed:

> Freedom of speech is not merely freedom to speak; it is also freedom to read. <u>Stanley v. Georgia</u>, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); <u>Lamont v. Postmaster General</u>, 381 U.S. 301, 306-07, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); <u>Conant v. Walters</u>, 309 F.3d 629, 643 (9th Cir.2002). Forbid a person to read and you shut him out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect. Not that there aren't valid penological reasons for limiting prison inmates' access to certain types of book. <u>Bahrampour v. Lampert</u>, 356 F.3d 969, 973-74 (9th Cir. 2004); <u>Duamutef v. Hollins</u>, 297 F.3d 108, 113 (2d Cir. 2002); <u>Mauro v. Arpaio</u>, 188 F.3d 1054 (9th Cir. 1999); 169 F.3d 313, 315-16 (5th Cir. 1999). <u>Chriceol v. Phillips</u>, 169 F.3d 313, 315-16 (5th Cir. 1999).[11]

<u>King v. Federal Bureau of Prisons</u>, 415 F.3d 634, 639 (7th Cir. 2005).

At the same time however, a prison inmate may only exercise those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. <u>See</u> <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974). Thus, pursuant to the seminal case <u>Turner v. Safley</u>, 482 U.S. 78 (1987), the Supreme Court has recognized that prison rules may restrict a prisoner's constitutional rights if they are "reasonably related to legitimate penological interests" and are not an "exaggerated response" to such concerns. 482 U.S. at 87.

> <u>Turner</u> sets forth four factors that courts should consider in making that determination. First, we ask whether there is a "valid rational connection" between the prison regulation and

---

[11]    In both <u>Bahrampour</u>, and <u>Mauro</u>, the courts upheld policies that banned the receipt by prisoners of sexually explicit materials because they were related to legitimate penological interests. In <u>Duamutef</u>, the court upheld a 30-day "mail watch" on a prisoner which was triggered by his receipt through the mail of a book with the phrase "Blood in the Streets" as part of the title, where he had a history of disciplinary problems in the prison system and involvement in an organization that advocated the overthrow of the government and other "revolutionary" activity. In <u>Chriceol</u>, the court upheld the officials' policy of withholding mail to prisoners that had potential of producing violence by advocating racial, religious, or national hatred.

the government interest justifying it. Id. at 89-90, 107 S.Ct. 2254. Second, we consider whether there is an alternative means available to the prison inmates to exercise the right. Id. at 90, 107 S.Ct. 2254. Third, we examine whether an accommodation would have "a significant 'ripple effect'" on the guards, other inmates, and prison resources. Id. Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests." Id. at 90-91, 107 S.Ct. 2254.

Murphy v. Missouri Dep't of Corr., 372 F.3d 979, 982-983 (8th Cir. 2004), cert. denied, 125 S.Ct. 501 (2004); see also Bonner v. Outlaw, 552 F.3d 673, 678 (8th Cir. 2009) (citing Turner factors).

Based on the factors identified in Turner, "[a] regulation valid and neutral in other respects may be invalid if it is applied to the particular items in such a way that negates the legitimate concerns." Murphy, 372 F.3d at 986 (citing Thornburgh v. Abbott, 490 U.S. 401, 419 (1989)); see also Baasi v. Fabian, NO. CIV. 09-781 (PAM/RLE), 2010 WL 924384 at *11 (D. Minn. March 11, 2010) ("The Plaintiff does not challenge the constitutionality of DOC Directive . . . Plaintiff alleges that the book he purchased, by virtue of its listing in a bookseller's catalog in the 'Anthropology' section, falls within the anthropological and/or educational exception to the ban on sexually explicit materials. According to the Plaintiff, the Defendants' practice of requiring that a prisoner be enrolled in a class, in order to obtain materials which fall within an exception to that ban, is unreasonably restrictive. Accordingly, we proceed to an 'as-applied' analysis, under the Turner factors."); Semler v. Ludeman, NO. CIV 09-0732 (ADM/SRN), 2010 WL 145275 at *9 (D. Minn. Jan. 08, 2010) ("Turner analysis applies equally to facial and as-applied constitutional challenges.") (citation omitted); Hodgson v. Fabian, NO. CIV. 08-5120 (JNE/SRN), 2009 WL 2972862 at *8 (D. Minn. Sept. 10, 2009) ("When an

inmate challenges the constitutionality of a prison's denial of a specific piece of mail, the question for the court is whether a ban on the particular items is reasonably related to legitimate penological objectives. A valid neutral regulation may be invalid if it is applied to particular mail items in a way that negates legitimate concerns.") (citations omitted).

Under <u>Turner</u>, the first consideration is whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest offered to justify it. "[P]rison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." <u>Thornburgh</u>, 490 U.S. at 408 (citing <u>Procunier v. Martinez</u>, 416 U.S. 396, 404-405 (1974)); <u>see also</u> <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003) (string citation omitted) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."); <u>Murphy</u>, 372 F.2d at 983 ("We accord great deference to the judgment and expertise of prison officials, "particularly with respect to decisions that implicate institutional security.'") (quoting <u>Goff v. Graves</u>, 362 F.3d 543, 549 (8th Cir. 2004)). This first <u>Turner</u> factor requires the Court to "determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective."

<u>Thornburgh</u>, 490 U.S. at 414.  As to neutrality, "[w]e have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." <u>Id.</u> at 415 (citing <u>Turner</u>, 482 U.S. at 90).

As to the second factor – whether there are alternative means of exercising the right that remain open to prison inmates – "[a]lternatives . . . need not be ideal, however; they need only be available."  <u>Overton</u>, 539 U.S. at 135.

With respect to the third consideration – what impact an accommodation of the constitutional right will have on prison staff and other inmates, and on the allocation of prison resources generally – the Supreme Court again reminded litigants that "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correction officials."  <u>Turner</u>, 482 U.S. at 90.

Finally, in analyzing whether there are ready alternatives for furthering the government interest available, the Supreme Court recognized.

> This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."

<u>Turner</u>, 482 U.S. at 90-91; <u>see</u> <u>also</u> <u>Overton</u>, 539 U.S. at 136 ("<u>Turner</u> does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to

some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal.").

In their motion for summary judgment and in response to Calhoun's' cross motion for summary judgment, defendants argued that their denial of his request to order books from a non-approved vendor was based on facility policies that are reasonably related to legitimate penological interests and should be upheld based on the Turner factors. In support of this contention, defendants submitted CCA Policy 16-1, the PCF Memorandum, the numerous written requests by Calhoun and defendants' responses to these requests, and the Affidavit of Assistant Warden Schreier which stated in relevant part:

> 2.      I am familiar with CCA's Corporate and Facility Policy, 16-1, Resident Mail, which provides that books, magazines, newspapers, and other printed matter may be approved for inmates unless deemed to constitute an immediate and tangible threat to the security of the facility. Attached hereto as Exhibit 1 is a true and correct copy of Policy 16-1. This Policy addresses incoming mail to residents; it does not address CCA and PCF's policy regarding inmates purchases and/or orders from an outside source or vendor.
>
> 3.      PCF's policy regarding inmate purchasing and ordering from approved and non-approved vendors is outlined CCA's Package/Property Orders/Clothing Exchange policy, a copy of which is attached hereto as Exhibit 2 and which was in effect during Plaintiff's incarceration. PCF inmates are only allowed to purchase books through PCF's approved vendor, Edward R. Hamilton. Case Managers must sign off on all purchase orders. Any item/package that arrives at PCF, not having come from an approved vendor (free or not) or not having proper prior authorization will not be allowed. I gave Plaintiff a copy of this Policy.
>
> 4.      If an inmate cannot order an item from PCF's approved vendor list, the inmate may request to order the item from a non-approved vendor, provided the item has an educational or legal need or benefit and the inmate's Unit

Manager approves of the order. The Unit Manager has complete discretion in approving orders from approved and non-approved vendors.

5.     PCF also allows inmate inter-library loan privileges, meaning that if an inmate cannot locate a book at PCF's library and cannot order it through PCF's approved vendor list, PCF will allow the inmate to request the book from Minnesota's statewide library system.

6.     I denied Plaintiffs request to order "The Redemption Manual" and "The Complete Battle" because Plaintiffs request conflicted with PCF's Properly/Package Order policy because the books were from a non-approved vendor and the books were not of an educational or legal need or benefit. Additionally, PCF's law library or the Minnesota library system could readily assist Plaintiff with any of his legal needs.

7.     Allowing Plaintiff to order books from a non-approved vendor would directly impact PCF prison officials, other inmates, and burden PCF's resources. PCF would be unable to efficiently manage books sent from nonapproved vendors and additional inmates would likely demand to order from nonapproved vendors. PCF's policy is reasonably related to legitimate penological interests because PCF needs to manage and control inmates' personal properly.

See Schreier Aff., ¶¶ 2-7.

Applying this evidence to the Turner factors, defendants first contended that without the PCF policy that required inmates to order books from an approved vendor or with case manager approval, it would be difficult for PCF officials to monitor the books in inmates' possession, it would take time away from other official prison duties, and PCF would have no control over non-approved entities or vendors. Defs.' Mem. at p. 13; see also Defendants' Response to Plaintiff's Cross-Motion for Summary Judgment and Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment [Docket No. 56] ("Defs.' Reply") at p. 6.  Defendants denied that their policies had anything to do

with "censorship of the books," their "sentiments, beliefs, or views," or "suppression of Plaintiff's right to intellectual liberation or consciousness."  Defs.' Reply at p. 6 (quoting Pl.'s Mem. at pp. 15-16).  Defendants cited Rogers v. Kemna, NO. 06-4124-CV-C-SOW, 2008 WL 596250 (W.D. Mo. March 04, 2008) for their position that the CCA policy requiring Calhoun to purchase books from an approved commercial vendor was reasonably related to legitimate penological interests.  See Defs.' Mem. at p. 11.

Defendants then asserted that alternative means existed for the exercise of Calhoun's First Amendment rights – i.e. he could order the books from the law library at the PCF, the Minnesota Library System or directly from the publisher of the books or another publisher.  See Defs.' Mem. at p. 13; Defs.' Reply at p. 6.

As to the impact of allowing Calhoun to purchase books from a non-approved vendor would impact PCF, defendants submitted:

> Allowing Plaintiff to order books from a non-approved vendor would directly impact PCF prison officials, other inmates, and burden PCF's resources.  PCF would be unable to efficiently manage books sent from non-approved vendors and additional inmates would likely demand to order from non-approved vendors.

See Schreier Aff., ¶ 7.  According to defendants, these additional requests for approval of books from non-approved vendors, would place a burden on the time of PCF officials. See Defs.' Mem. at pp. 13-14; Defs.' Reply at p. 7.

Finally, defendants maintained that Calhoun could not point to an alternative method that could accommodate his rights and impose nothing more than a de minimus cost on PCF.  See Def.'s Mem. at p. 14; Defs.' Reply at p. 7.

Calhoun countered that there was no rational connection to any legitimate penological interests to justify defendants' refusal to permit him to purchase the books

he requested when these purchases were permitted by both CCA Policy 16-1 and the PCF Memorandum, he had obtained the approval of the Education Principal Anderson to purchase the books, and defendants' refusal violated WDOC Policy 450.100 governing receipt of mail by Washington inmates, WDOC Policy 590.500 governing legal access for Washington inmates, and the contract between CCA and WDOC. [12] See Pl.'s Mem. at pp. 15-17 (citing Pl.'s Exs. M, O, U, W and X, and Schreier Aff. ¶¶ 4, 6); Pl.'s Reply at pp. 4-8, 16. Instead, Calhoun maintained that defendants had based their rejection on "their own personal feelings, sentiments, or views of the materials['] philosophical subject matter and content" and belief that the requested books were not educational or legal in nature. Id. Calhoun observed that none of the policies applicable to PCF inmates required that the books contain educational or legal benefits. Pl.'s Reply at p. 3. Additionally, Calhoun argued that defendants never explained how ordering a few soft cover books would burden the PCF mailroom, given that PCF

---

[12] To the extent that Calhoun was asserting that WDOC Policies or the contract between CCA and WDOC created an independent basis for relief, the Court notes that he cannot seek relief in federal court under 42 U.S.C. § 1983 based on alleged violations of Washington laws or correctional policies. See Nicolaison v. Milczark, 26 Fed. Appx. 596, No. 01-3084, 2002 WL 15669 at *1 (8th Cir. 2002) (citing Marler v. Mo. State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir. 1996); Treleven v. Univ. of Minn., 73 F.3d 816, 819 & n. 4 (8th Cir. 1996)); see also Schwindling v. Smith, 777 F.2d 431, 433 (8th Cir. 1985). This is because "a violation of state law, without more, does not state a claim under the federal Constitution or 42 U.S.C. § 1983." Marler v. Mo. State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir. 1996) (citation omitted). While it is true that a state claim might be actionable under this Court's discretionary exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), the Court further notes that there is a dispute of material fact as to whether WDOC Policies and the apply to PCF. See McMahon Aff., Exs. H (stating "we don't follow WA policy"), Y (stating only CCA mail policy applied). In any event, as this Court has concluded as a matter of law that defendants' actions amounted to an unconstitutional application of the CCA Policy 16-1 and PCF Memorandum without any reference to or reliance on WDOC's policies, this Court does not reach the applicability of WDOC policies or the contract between CCA and WDOC to the issues at hand.

already has a "personal property matrix"[13] that limited the amount of materials an inmate could possess, or how the books could pose a threat to the security of PCF.  See Pl.'s Reply at p. 12.  In sum, Calhoun asserted that having failed to establish that the books he wanted to buy amounted to a threat to the security, good order or discipline of the PCF, defendants' categorical refusal to allow him to obtain these books from an alternative vendor was unconstitutional.

As to the second Turner factor, Calhoun represented that he attempted to obtain the requested books through the PCF library, the Minnesota Statewide Library System and through the approved vendor, but none of these sources could provide to him the books.  See Pl.'s Ex. W at Ex. B (January 13, 2009 Letter to Edward R. Hamilton); Pl.'s Mem. at p. 17, Ex. A-2 (PCF Library Inter Library Loan Rejection Slip).

With respect to the third factor, Calhoun responded that CCA Policy 16-1.5 and the PCF Memorandum were created to alleviate any adverse impact on guards and the allocation of prison resources.  See Pl.'s Mem. at pp. 18-19.  Calhoun also submitted that PCF's mailroom would not be overburdened by his request to receive a few "soft-back" books that do not contain content contrary to the security and discipline of PCF. Id. at p. 19.

On the fourth Turner factor, Calhoun argued that an alternative method was not required and no additional costs would be incurred by PCF – rather all defendants had to do was follow their own policies which permitted him to purchase books from non-approved vendors.  See Pl.'s Mem. at p. 20.

---

[13]     Calhoun did not attach or describe in greater detail the "personal property matrix."

Based on a review of the entire record and arguments of the parties, this Court finds that there are no material disputes of fact that preclude summary judgment and that summary judgment in Calhoun's favor on the issue of defendants' denial of the books requested by him is warranted. As discussed below, the Court concludes that defendants' application of various policies bearing on Calhoun's requests to acquire the books at issue in this case and denial of these requests, violated his rights under the First Amendment. Thus, this Court recommends that defendants' motion for summary judgment be denied, Calhoun's motion for summary judgment be granted, and this case proceed forward to address Calhoun's request for compensatory and punitive damages.[14]

### 1. First <u>Turner</u> Factor: Whether there is a Valid, Rational Connection" between the Prison Regulation and the Governmental Interest

Initially, the stated reason given by defendants to Calhoun for denying his requests for the books was that they had to be purchased from approved vendors. <u>See</u> McMahon Aff., Exs. D, E, F, K, M, O, V, X; Pl.'s Exs. C, D, H, I, K, M, T, W. When Calhoun persisted in his requests, defendants denied the requests on the basis that Calhoun had an adequate law library at his disposal and because they felt that the substance of the books, based on their review, was not legal in nature. <u>See</u> McMahon

---

[14] Since commencement of this suit, Calhoun has been transferred to Coyote Ridge Correctional Center in the State of Washington and thus no longer subject to the policies of PCF. Therefore, his §1983 claims for injunctive and declaratory relief are moot. <u>See</u> <u>Pratt v. Corr. Corp. of Am.</u>, 267 Fed. Appx. 482, 2008 WL 612571 at *1 (8th Cir. 2008) (table decision) (concluding inmate's § 1983 claims for declaratory and injunctive relief were moot when he was transferred to another facility and was no longer subject to alleged unlawful conditions); <u>Smith v. Hundley</u>, 190 F.3d 852, 855 (8th Cir. 1999) (same).

Aff., Exs. N, O, Q, S, T, U, X; Pl.'s Exs. L, M, O, Q, R, S, W.

Now, in support of their motion for summary judgment, defendants stated that Calhoun's requests for "The Redemption Manual" and "The Complete Battle"[15] were denied because they were from a non-approved vendor and were not for an educational or legal need or benefit, as required by the PCF Memorandum. See Schreier Aff., ¶¶ 5, 6.

The only "evidence" defendants provided to this Court to support their contention that "PCF's policy is reasonably related to legitimate penological interests" is the single statement by Assistant Warden Schreier that "PCF needs to manage and control inmates' personal property." See Schreier Aff., ¶ 7.[16] Assuming that the management and control of inmate's property is a legitimate penological interest, the evidence does not support a rational connection between defendants' actual or proffered reasons[17] for

---

[15] There is no reference in the evidence submitted or in defendants' supporting materials as to why "Cracking the Code" was denied, other than the possibility that Calhoun asked to order the book from an alternative vendor. See McMahon Aff., Ex. AA. Defendants' supporting affidavit, which sets forth the reasons for denying "The Redemption Manual" and "The Coming Battle," fails to mention "Cracking the Code". See Schreier Aff., ¶ 6.

[16] The balance of Paragraph 7 of Schreier's Affidavit addresses the third Turner factor – i.e. whether an accommodation would have a significant effect on the guards, other inmates, and prison resources. See Murphy, 372 F.3d at 982-983 (quoting Turner, 482 U.S. at 90-91).

[17] In their briefs, defendants argued that without the policy set forth in PCF Memorandum, it would be difficult to monitor books in an inmate's possession, PCF would have no control over non-approved entities or vendors, and PCF officials would be required to monitor and review each non-approved vendor request, taking time away from other duties. See Defs.' Mem. at p. 13; Defs.' Reply at p. 6. Even assuming that defendants had submitted sworn testimony to support these arguments (which they did not), and these reasons addressed a "legitimate penological interest" (as opposed to the other Turner factors), as set out more fully in this decision, the fact remains that neither

rejecting Calhoun's requests for the books and this stated interest. An action "cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the [application of the] policy arbitrary or irrational." <u>Turner</u>, 482 U.S. at 89-90.

For starters, defendants' denial of Calhoun's requests for the books on grounds that they must be purchased from an approved vendor finds no substantiation in either the CCA Policy 16-1 or the PCF Memorandum. CCA Policy allows receipt of publications from "vendors" generally (<u>see</u> CCA Policy 16-1.4, 16-1.5-H); PCF Memorandum allows inmates to purchase books from an approved vendor and from "another reputable/verifiable vendor" if the inmate cannot find the book from an approved vendor and the Unit Manager approves the request. Contrary to the defendants' articulated reasons for denying Calhoun's requests, these policies explicitly allow purchases of books from <u>both</u> approved and non-approved vendors,

Second, Schreier's statements to the contrary, neither CCA Policy 16-1 nor the PCF Memorandum required that books requested for purchase by an inmate from a non-approved vendor be educational or legal in content.[18] The only restrictions placed on the content of any books received by an inmate are those expressed in CCA Policy 16-1 which prohibited the receipt of any publications, including books, that constituted "a threat to the security of the institution," an "immediate and tangible threat to the security

---

CCA Policy No. 16-1 nor the PCF Memorandum provide a foundation for these arguments, much less a basis for denying Calhoun his requests.

[18] In the event that defendants are relying on the separate section of the PCF Memorandum bearing on "Educational Items" (<u>see</u> Schreier Aff., Ex. 2), this section affords them no assistance as Calhoun did get approval from the Educational Principal Anderson for the books he had requested. <u>See</u> McMahon Aff., Ex. J; Pl.'s Ex. A.

or order of the facility," or where a reasonable belief existed to justify limitations based on "public safety or facility order and security." Schreier Aff., Ex. 1 (CCA Policy 16-1.4, 16-1.5-D, and 16-1.5-H). Defendants never rejected Calhoun's requests on these grounds or on the more specific criteria set forth in CCA Policy 16-1.5-H(2)(a)-(e) – i.e., that the books contained instruction for the manufacturing of illicit items, advocated violence or serious disruption of facility security or order within the facility, or encouraged deviate sexual behavior.

Moreover, given prison regulations restricting inmates' First Amendment rights are to operate "in a neutral fashion, without regard to the content of the expression," (Thornburgh, 490 U.S. at 415 (citing Turner, 482 U.S. at 90)), and an inmate's First Amendment right includes the right "to receive information and ideas," (Kleindienst, 408 U.S. at 762-63 (internal citations omitted)) and "to read", (Stanley, 394 U.S. at 564), this Court can divine no legitimate penological interest that would permit a prison to limit purchases of books to only those that have an educational or legal benefit. In fact, not only does PCF place no such requirement on purchases or acquisitions of books from an approved vendor, the publisher, the prison library or the Minnesota Statewide library system, but Calhoun was encouraged on several occasions to request the books he sought from these sources. In short, where an inmate can obtain any book he wants from an approved vendor, the publisher, the prison library or the Minnesota Statewide library system, without regard to substance (except to the extent that it constitutes "a threat to the security of the institution," an "immediate and tangible threat to the security or order of the facility," or where a reasonable belief exists to justify limitations based on "public safety or facility order and security"), there is no rational basis for categorically

limiting or censoring the substance of a book from a non-approved vendor based solely on the fact that it does not come from an approved source.

As to defendants' statement that that "PCF's policy is reasonably related to legitimate penological interests because PCF needs to manage and control inmates' personal property," (Shreier Aff., ¶ 7), or their proffered arguments as to why PCF's policy is reasonably related to legitimate penological interests, neither the statement or arguments pass muster. For example, if it is defendants' position that they could not control the number of the books an inmate might possess, no evidence or argument was submitted to suggest that PCF was having trouble keeping track of the property of inmates generally, or Calhoun's property, in particular. Besides, PCF already had a policy in place that limited when inmates could order packages and the number of packages they could receive. See Schreier Aff., Ex. 1 (CCA Policy 16-1.5-J(3)). CCA Policy 16-1.5-J(3) also provides that if an inmate's property totals exceeded the amounts allowed, "the excess property must be disposed of – as provided by Policy – prior to the issuance of incoming property." Id. (emphasis omitted); see also Counter Affidavit of Abdul Khalif Calhoun Point for Point to Refute Assistant Warden Barbara Seidl Schreier's Affidavit in Support Defendants' Motion for Summary Judgment/Affidavit in Support of Plaintiff's Cross Motion for Summary Judgment in Opposition [Docket No. 47] at p. 10 ("PCF has established the Personal Property Matrix as mentioned before, which permits inmates to retain a particular amount of books as long as the quantity of materials do not exceed the limits set by the property matrix.").

In the same vein, if defendants were suggesting that they could not control the contents of the books an inmate might possess, again, CCA Policies 16-1.4, 16-1.5-D,

and 16-1.5-H all allowed PCF to restrict the receipt of any publications, including books, if the material constituted a "threat to the security of the institution," "for reasons of public safety or facility order and security" or an "immediate and tangible threat to the security or order of the facility" – reasons never given for the denial of Calhoun's requests for books.

As to defendants' argument that without the "policy," they would have no control over non-approved vendors, as a preliminary matter, this Court finds that this rationale is too conclusory to warrant consideration.  See Murphy, 372 F.3d at 986.[19]  Unlike in Rogers, supra,[20] there is no evidence or argument before the Court remotely suggesting

---

[19]    In Murphy, the Eighth Circuit concluded that:

> MDOC followed its procedure in reviewing Issue 36 of The Way, but documented its conclusion only with the statement that the issue was "so racially inflammatory as to be reasonably likely to cause violence." Although MDOC's procedure is reasonably related to legitimate penological interests, we conclude, based on our independent review of the evidence, that a material issue of fact remains as to whether MDOC's choice to censor Issue 36 satisfies the Turner factors. As we read it, Issue 36 does not appear to counsel violence, and MDOC's documented reason for censoring the item is too conclusory to support a judgment in its favor on this issue. We recognize and defer to the expertise of prison officials on what is likely to be inflammatory in the prison environment, but summary judgment would be appropriate only if MDOC presented some specific evidence of why this particular item implicates prison concerns.

372 F.3d at 986 (emphasis added).

[20]    In Rogers, the prison policy at issue required "inmates wishing to obtain personal property, to be held by them in the prison, to purchase such property from the prison canteen or from approved commercial vendors."  2008 WL 596250 at *2.  The court found that the policy met the first Turner factor, reasoning:

that the distinction between an approved vendor and an unapproved vendor such as American's Bulletin, is a meaningful one. In fact, defendants have not presented any evidence addressing any criteria an organization or company must meet to become an approved vendor under their policy.[21] Further, having affirmatively stated in the PCF Memorandum that as an alternative to using an approved vendor, inmates can obtain books from a "reputable/verifiable vendor," defendants cannot ignore this provision and claim they have no ability to control the use of a non-approved vendor.

The Court also finds that defendants' assertion that "PCF officials would be required to monitor and review each non-approved vendor request, taking time away

---

> [W]ithout the policy, prison officials could not limit the amount of personal property, in this case specifically books, sent to an offender because the prison cannot control the actions of outside persons and entities. Without the policy, it would be exceedingly difficult to monitor the books in prisoners' possession. Defendants set forth evidence that limiting the number of books held by prisoners is necessary to ensure safety and security in the prison. The affidavit of Arthur Wood, the Associate Superintendent of Offender Management at JCCC, states that limits on the amount of books and other personal property an inmate has in his cell are specifically used to limit an inmate's ability to hide contraband within his cell, to prevent the cell from becoming a fire hazard, and for many other safety concerns.

Id.

The present case is distinguishable from Rogers, in part, because Rodgers only involved a facial challenge of the policy, whereas here, the challenge pertains to the application of the vendor policy as it relates to Calhoun's requests. Further, the policy in Rodgers involved no exceptions to the approved vendor policy. In this case, CCA Policy No. 16-1.5-H(1), together with the PCF Memorandum, permitted purchases of books from a non-approved "reputable/verifiable vendor" upon approval of either their unit manager or a educational principal (as it relates to educational materials). See Schreier Aff., Exs. 1, 2.

[21] Indeed, defendants have never based their denial of Calhoun's request for the books on the fact that American Bulletin did not meet their criteria for a "reputable/verifiable vendor."

from other prison duties" (Defs.' Mem. at pp. 13-14; Defs.' Reply at pp. 6-7), to be arbitrary and not rationally related to any legitimate interest. Again, the Court makes this finding, in part, because the PCF Memorandum specifically provides that an inmate can obtain a book, with prior permission, from a "reputable/verifiable vendor" to the extent that he cannot obtain it from an approved vendor. If defendants' rationale were accepted, the provision allowing inmates to seek books from non-approved vendors would be rendered a nullity. Refusal to follow prison policies and the resulting prohibition of books from any non-approved vendor would amount to an unconstitutional ban in violation of the First Amendment. See Brimeyer, 116 F.3d at 353-54 ("Williams was correct when he charged that his mailings from the CJCC were being denied without having gone through the prison's review process. There was, in effect, a blanket ban on those materials, and Williams' First Amendment rights were violated when the prison withheld them from him."). In sum, stating on the one hand that inmates can ask for permission from staff to purchase books from a non-approved vendor, but then asserting on the other hand, that such a request is properly denied because it would unduly burden staff, leaves the inmate with nothing in hand at all.

For all of these reasons stated, this Court concludes that defendants' denial of Calhoun's request to purchase "The Redemption Manual," "The Coming Battle," and "Cracking the Code" from an unapproved vendor was not reasonably related to legitimate penological objectives.

### 2. Second Turner Factor: Whether there are Alternative Means of Exercising the Right

As to the second factor – whether there are alternative means of exercising the right that remain open to prison inmates – the Court finds that the undisputed evidence

in the record supports a finding that no such alternatives sufficiently exist.

Here, the evidence established that the PCF library did not have the requested books; when Calhoun asked to order a book from a publisher, his requests were rejected;[22] and the books he sought were not available through the approved vendor. See Pl.'s Mem. at p. 18; See McMahon Aff., Exs. E, F; Pl.'s Exs. A-2, D, H, W at Ex. B; Calhoun Aff. dated January 25, 2010, ¶ 6; Calhoun Aff. dated February 18, 2010, ¶ 6.

The undisputed evidence supports a finding that there was no alternative means for Calhoun to obtain the information contained in "The Redemption Manual," "The Coming Battle," and "Cracking the Code."

### 3. Third Turner Factor: Impact the Accommodation of the Constitutional Right Will Have on Prison Staff and Other Inmates

This Court acknowledges that if Calhoun is successful in his present legal action, other inmates may be emboldened to make similar requests to purchase books from non-approved vendors and litigate denials of their requests. However, the fact remains that it is PCF, and not a requested accommodation of the Calhoun's constitutional First Amendment rights, that has created this "burden." Put another way, it is hard to fathom what burden could have resulted from granting Calhoun his requested books when pursuant to the PCF Memorandum, prison officials are required to review inmate requests to buy books from non-approved vendors regardless of what books Calhoun

---

[22] It is not even clear to the Court whether the prison would have permitted Calhoun to obtain the books directly from the publisher. CCA Policy No. 16-1.5-H(1) provides that "[b]ooks . . . may only be mailed to an inmate/resident from a publisher or a vendor/book club." See Schreier Aff., Ex. 1. On the other hand, the PCF Memorandum states, "[a]ny item/package that arrives at Prairie Correctional Facility, not having come from an approved vendor (free or not) or not having prior authorization will not be allowed." Id., Ex. 2.

did or did not receive.  Similarly, the Court cannot comprehend what sort of additional burden would be placed on the PCF mailroom if Calhoun had been allowed to purchase books from non-approved vendors, where the mail staff was already required to review all incoming packages regardless of origin.  <u>See</u> Schreier Aff., Ex. 1 (CCA Policy 16-1.5-J(3)).

### 4.    Fourth <u>Turner</u> Factor: Accommodating Calhoun's Rights at a De <u>Minimis</u> Cost

Defendants already have a review process in place for books from non-vendors and to examine the contents of books.  Defendants followed this process and even attempted to look at the content of the requested books.  While it is conceivable that there would be more than a <u>de</u> <u>minimis</u> cost to determine whether a non-approved vendor is reputable or verifiable, or whether the requested books contained content that constituted a threat to the security of the institution, public safety or facility order as set forth in CCA Policy 16-1.5-H, (<u>see</u> Schreier Aff., Ex. 1), these review processes are already in place.  Presumably any burden associated with their performance was already taken into account when they were instituted.  Therefore, this Court concludes that the undisputed evidence supports a finding that conducting a review of the requested materials and proposed vendor amounts to no additional cost to CCA and PCF.

Based on its analysis of all of the <u>Turner</u> factors, the Court finds that CCA and PCF's policies as applied Calhoun, are not "reasonably related to legitimate penological interests."  <u>Turner</u>, 482 U.S. at 78.  Therefore, this Court concludes that defendants impermissibly restricted Calhoun's First Amendment right to receive information and ideas, and summary judgment, should be granted in favor of Calhoun.

**B.**   **Damages**

In his damages section, Calhoun has asked for compensatory damages in the amount of $11,111.00 against each defendant and punitive damages in the amount of $13,111.00 against each defendant.  Calhoun has not set forth how he arrived at these amounts.  However, as he has not alleged any physical injury to his person, to the extent that Calhoun may be seeking damages for emotional distress, any such claim should be dismissed.   The Prison Litigation Reform Act, 42 U.S.C § 1997e(e),[23] precludes claims for damages brought by prisoners for emotional distress without a showing of physical injury.  Royal v. Kautzky, 375 F.3d 720, 722-23 (8th Cir. 2004).

However, "proof of actual damages is unnecessary to establish a constitutional violation. . . ."  Bolin v. Black, 875 F.2d 1343, 1350 (8th Cir. 1989), cert. denied, 493 U.S. 993 (1989).  When an inmate seeks to "vindicate constitutional rights whose deprivation has not caused an actual, provable injury," nominal damages may be appropriate.  Corpus v. Bennett, 430 F.3d 912, 916 (8th Cir. 2005) (quoting Westcott v. Crinklaw, 133 F.3d 658, 662 (8th Cir. 1998)); see also Risdal v. Halford, 209 F.3d 1071, 1073 (8th Cir. 2000) (instructing the district court to award one dollar in nominal damages where a jury found for the § 1983 plaintiff but found no actual damages).  In addition, punitive damages are allowed as a means to redress constitutional violations. See Royal, 375 F.3d at 723-24.

The determination of any compensatory damages and punitive damages should be decided at trial.

---

[23]   Section 1997e(e) provides, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."

## IV. CONCLUSION

This Court finds that defendants' application of CCA Policies and the PCF Memorandum on Calhoun's request to acquire the books at issue in this case, violated his rights under the First Amendment. Summary judgment should be granted to Calhoun on this First Amendment claim. This case should proceed to trial to address Calhoun's request for compensatory and punitive damages.

## **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1.      Defendants' Motion for Summary Judgment [Docket No. 27] be **DENIED**.

2.      Plaintiff's Cross Motion for Summary Judgment [Docket No. 50] be **GRANTED**. This case should proceed forward to trial to address Calhoun's request for compensatory and punitive damages.

3.      Plaintiff's Motion for Response to Defendants' Summary Judgment [Docket No. 61] be **GRANTED** as defendants offered no opposition to the Motion.

4.      Plaintiff's Motion for Telephonic Appearance [Docket No. 69] be **DENIED**, as plaintiff has failed to set forth why a "pretrial conference hearing" is necessary.

Dated:      July 16, 2010

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 30, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.